UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Pablo Murillo and Global Mercantile, LLC,

      Plaintiffs,

v.

Mayo Clinic Health System-Southeast
Minnesota Region,

      Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 21-1654 ADM/TNL

---

Yury Suponitsky, Esq., Morris Law Group, P.A., Edina, MN, on behalf of Plaintiffs.

Michael F. Cockson, Esq., D. Charles McDonald, Esq., and Joshua N. Turner, Esq., Faegre Drinker Biddle & Reath LLP, Minneapolis, MN, on behalf of Defendant.

---

## I. INTRODUCTION

On November 9, 2021, the undersigned United States District Judge heard oral argument on Defendant Mayo Clinic Health System-Southeast Minnesota Region's ("Mayo") Motion to Dismiss [Docket No. 6]. Plaintiffs Pablo Murillo ("Murillo") and Global Mercantile, LLC ("Global Mercantile") allege Mayo breached a Purchase Agreement in which Mayo agreed to sell commercial real estate located in Red Wing, Minnesota to Global Mercantile. Plaintiffs also allege that Mayo engaged in racial discrimination in contracting, in violation of 42 U.S.C. § 1981. For the reasons stated below, Mayo's Motion is granted.

## II. BACKGROUND

### A. Parties

Plaintiff Global Mercantile is a Minnesota limited liability company with a registered office in Bloomington, Minnesota. Compl. [Docket No 1] ¶ 3. Plaintiff Murillo is of Hispanic ethnicity and resides in Minnesota. Id. ¶ 4. Murillo is the founder and Chief Executive Officer

of Global Mercantile.  Id.

Defendant Mayo is a Minnesota nonprofit corporation with a registered office in Austin, Minnesota.  Id. ¶ 5.

## B.  Purchase Agreement

Mayo owns property in Red Wing, Minnesota known as the Professional and Community Center ("PCC").  Id. ¶ 6.  On January 3, 2019, Global Mercantile entered into a Commercial Real Estate Purchase Agreement ("Purchase Agreement") with Mayo to purchase the PCC for $1.00.  Id. ¶¶ 12–13; Cockson Aff. [Docket No. 9] Ex. 1 (Purchase Agmt.) §§ 1–2.  Global Mercantile planned to develop the PCC into market-rate and affordable housing for the Red Wing community.  Compl. ¶ 8.

Although the actual value of the PCC was significantly higher than $1.00, the Purchase Agreement stated that Mayo had a "genuine concern and sincere intent to meaningfully assist Red Wing, Minnesota's well documented shortage of housing," and that Mayo was making the PCC available to Global Mercantile to "facilitate [Global Mercantile's] intent to repurpose the [PCC] for mixed use and entry level workforce housing for the Red Wing community."  Purchase Agmt. § 2(c); Compl. ¶ 13.

The Purchase Agreement required Global Mercantile to satisfy five contingencies ("Buyer Contingencies") by April 4, 2019 (the "Contingency Date") unless Global Mercantile waived the Buyer Contingencies in writing.  Purchase Agmt. § 4.1.  The parties agreed that if any of the Buyer Contingencies were not satisfied or waived in writing by the Contingency Date, the Purchase Agreement would automatically terminate.  Id. § 4.2.  The provisions governing the Buyer Contingencies and automatic termination are set forth in Sections 4.1 and 4.2, which state:

**4.1** <u>Buyer Contingencies</u>.  Seller acknowledges that Buyer intends to develop and operate a portion of the Real Property as a multiple unit housing facility. Unless waived by Buyer in writing, Buyer's obligations and rights under this Agreement are contingent upon the occurrence of each of the following (individually a "Buyer Contingency", and collectively the "Buyer Contingencies"):

    a. On or before April 4, 2019 (the "Contingency Date"), Buyer shall have approved in its sole and absolute discretion, Phase I (Environmental Assessment) final City Governmental approvals, including appropriate T.I.F. assistance with regard to the Real Property;

    b. On or before the Contingency Date, Buyer shall have determined, in its sole and absolute discretion that it is satisfied with the results of and matters disclosed by their inspections;

    c. On or before the Contingency Date, Buyer shall have determined, in its sole and absolute discretion, that (i) the Real Property is or will be within a time period acceptable to Buyer, serviced by all necessary utilities in order to support the development and operation of a multiple unit housing facility, including without limitation water and gas mains, electric power lines, communications and data, and sanitary and storm sewers; and (ii) all accesses to and from public road systems necessary to adequately service the multiple unit housing facility, including without limitation median cuts, curb cuts, changes in roads, and changes in access points, are in place or will be constructed and that Buyer will have satisfactory access thereof;

    d. On or before the Contingency Date, Buyer shall have obtained confirmation that the necessary governmental authorities approve Zoning for buyer's intended use; and,

    e. On or before the Contingency Date, Buyer shall have received a commitment for the financing necessary and sufficient in Buyer's opinion to implement Buyer's plans for the purchase and development of, and the improvements to, the Real Property, and to construct and operate the multiple unit housing facility.

**4.2** If any of the Buyer Contingencies are not satisfied or waived as evidenced by written notice from Buyer by the Contingency Date then this Agreement shall thereupon terminate and neither party shall have any further obligation to the other.  If such notice of satisfaction or waiver of each and all of the Buyer Contingencies is given, Seller and Buyer shall proceed to closing in

accordance with the terms hereof.

Purchase Agmt. §§ 4.1, 4.2.

The closing date in the Purchase Agreement was April 18, 2019, which Global Mercantile alleges was subsequently amended to May 10, 2019. Purchase Agmt. § 5; Compl. ¶¶ 18–19. The Purchase Agreement also included a "Time of the Essence" provision, which stated: "The parties hereto agree that time and time of payment are of the essence of this agreement." Purchase Agmt. § 11.

The Purchase Agreement included a Deed Use Restriction that prohibits Murillo from using the PCC to operate a medical clinic or provide patient clinical or surgical care or ancillary medical patient care services. Purchase Agmt. § 3.b., Ex. 2.

The parties agreed that the Purchase Agreement "constitutes the entire agreement between the parties," and that "[n]o waiver, consent, modification, or change of the terms of this agreement shall bind either party unless in writing and signed by the parties." Purchase Agmt. § 14.

## C. Events Transpiring After Execution of Purchase Agreement

After signing the Purchase Agreement, Plaintiffs invested significant time and money to further their plans for redeveloping the PCC, and retained the services of architects, designers, contractors, and sub-contractors. Compl. ¶¶ 14, 17. Many of the individuals and entities retained by Plaintiffs were people of color or minority-owned businesses. Id. ¶¶ 15–16.

Although the Buyer Contingencies in the Purchase Agreement required Global Mercantile to obtain city government approval for the redevelopment project by the April 4, 2019 Contingency Date, it is undisputed that Global Mercantile did not obtain the City of Red

Wing's approval before the Contingency Date, initial closing date, and amended closing date had passed. Compl. ¶ 32; Pl.'s Mem. Opp'n Mot. Dism. [Docket No. 17] at 7. It is also undisputed that Plaintiffs did not provide written notice that the Buyer Contingencies had been waived. Pl.'s Mem. Opp'n Mot. Dism. at 7. Nevertheless, Plaintiffs allege that after the amended closing date had passed, Mayo "continued to work with Plaintiffs and encouraged Plaintiffs to continue their efforts to redevelop the PCC." Compl. ¶ 20.

Plaintiffs' redevelopment plan was met with opposition by some Red Wing residents who voiced their concerns at Red Wing Planning Advisory Commission meetings in March and July of 2019. Id. ¶¶ 23–25. Residents allegedly stated that they did not want "welfare-subsidized people" living in their neighborhood and expressed concern that the planned development would increase crime and drugs in the community. Id.

The community opposition included a cartoon published in a Red Wing news publication depicting a "Global Mercantile and Associates" bus arriving in Red Wing from Chicago and parking in front of a building labeled "Mayo Subsidized Housing," with bus passengers drinking, smoking, and shooting guns. Id. ¶ 25. After the cartoon was published, a Mayo public affairs specialist sent an internal email expressing concerns that residents were "making up stories and dragging Mayo's name through the mud." Id. ¶ 26. Plaintiffs allege that Murillo asked Mayo how he could appease the community, and Mayo responded that he should hire more white individuals or white-owned companies to assist in the redevelopment, rather than using minority-owned businesses. Id. ¶ 28.

On July 22, 2019, the City of Red Wing approved Plaintiffs' application to redevelop the PCC. Id. ¶ 32. Plaintiffs allege that the community's opposition to the project intensified

following the City's approval. Id. ¶ 33.

On August 29, 2019 Mayo told Murillo in a phone call that it would not sell the PCC to Global Mercantile. Id. ¶ 34. On September 13, 2019, Mayo sent Murillo a letter stating they considered the Purchase Agreement terminated. Id. ¶ 36.

**D. Lawsuit**

Plaintiffs filed this lawsuit on July 20, 2021, asserting claims for racial discrimination under 42 U.S.C. § 1981 (Count I), breach of contract (Count II), specific performance (Count III), and equitable estoppel (Count IV). Mayo moves to dismiss all of Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. Mayo argues that all of Plaintiffs' claims fail because the Purchase Agreement automatically terminated when Global Mercantile failed to satisfy the Buyer Contingencies in the Purchase Agreement before the closing deadline and the closing never occurred.

### III. DISCUSSION

**A. Standard of Review**

Rule 12 of the Federal Rules of Civil Procedure provides that a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In considering a motion to dismiss, the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true. Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994); Ossman v. Diana Corp., 825 F. Supp. 870, 879-80 (D. Minn. 1993). Any ambiguities concerning the sufficiency of the claims must be resolved in favor of the nonmoving party. Ossman, 825 F. Supp. at 880.

Working in combination with Rule 8, Rule 12 requires the plaintiff's factual allegations

to "raise a right to relief above the speculative level," and push claims "across the line from conceivable to plausible." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007). In other words, the complaint must establish more than a "sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A pleading must relate "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but not 'shown'—'that the pleader is entitled to relief.'" Id. (quoting Fed. R. Civ. P. 8(a)(2)).

Ordinarily, if a district court relies on matters outside the pleadings in considering a motion to dismiss, the motion to dismiss is converted to one for summary judgment. Fed. R. Civ. P. 12(d). However, the Court may consider "materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record." Illig v. Union Elec. Co., 652 F.3d 971, 976 (8th Cir. 2011). Here, the Court has considered the Purchase Agreement because it is embraced by the pleadings.

B.  Analysis

   1.  **Contract Claims (Counts II and III)**

Plaintiffs allege that Mayo breached the contract by failing to close and provide the deed for the PCC, and by improperly terminating the Purchase Agreement without giving the notice required under Minnesota Statute § 559.21. Compl. ¶¶ 50–51, 55–56.  Plaintiffs seek specific performance of the parties' contract.  Id. ¶ 57.

Mayo argues that the claims for breach of contract and specific performance fail as a matter of law because the Purchase Agreement specified that time was of the essence, and the Purchase Agreement automatically terminated when the Contingency Date and closing dates passed without the Buyer Contingencies being satisfied.  Mayo also argues that the parties' conduct was not sufficient to extend the closing deadline to some indefinite future date, because an agreement to extend the deadline for purchasing real estate must be in writing or is barred by the statute of frauds.  Mayo further contends that the Purchase Agreement was not subject to the notice requirements of Minnesota Statute § 559.21 because the statute does not apply to agreements that are dependent on a contingency.

Plaintiffs respond that the Buyer Contingencies and the closing provisions in the Purchase Agreement were waived by the parties' course of conduct.  Plaintiffs contend that the parties continued to acknowledge the Purchase Agreement after the expiration of the Contingency Date and closing dates, and that as a result Mayo has waived the right to assert automatic termination.   Plaintiffs' arguments are unavailing because the Purchase Agreement expired on its own terms, and any agreement to extend the time for purchasing the PCC must be in writing as required by the statute of frauds.  The Purchase Agreement stated in Section 11 that

time was of the essence, yet Plaintiffs admit that the closing did not occur by the April 19 or May 10 closing date. Minnesota courts have long held that when an agreement states that time is of the essence, "the agreement must be performed within the time specified, or it cannot be performed at all." Cowley v. Davidson, 13 Minn. 92, 101 (1868)); see also Commercial Real Estate Transactions § 14:4 (3d ed.) ("The phrase 'time is of the essence' is a term of art meaning that the closing must occur at a specific time or the transaction will not occur" and that "the parties must comply with the established deadlines or risk losing their deposit or property."); Callender v. Kalscheuer, 184 N.W.2d 811, 812 (Minn. 1971) ("If the time for acceptance of an offer is limited, as here, the limit is absolute and time is of the essence."). Because the closing on the PCC did not occur by the established deadlines, the Purchase Agreement terminated.

Mayo's alleged conduct and representations after the missed closing date are not sufficient to extend the closing date. Minnesota's statute of frauds states requires that "[e]very contract for . . . the sale of any lands, or any interest in lands, shall be void unless the contract . . . is in writing." Minn. Stat. § 513.05. Additionally, "modification of a contract required to be in writing by the statute of frauds . . . is void unless it is also in writing." Wojahn v. Faul, 51 N.W.2d 97, 99 (1952). This principle applies here and bars Plaintiffs' contract claims.

The circumstances here are similar to those in Rooney v. Dayton-Hudson Corporation, 246 N.W.2d 170 (1976). In that case, the plaintiff argued that "the [real estate purchase] agreement, even if subject to termination by its terms on October 31, did not so terminate because the sellers, through their conduct and representations, extended the time in which the option could be exercised to January 15 of the next year." Id. at 174. The Minnesota Supreme Court was thus "confronted" with "the extension (by waiver) of the time within which an offer

can be accepted in order to form a completed contract of sale." Id. at 176.  The Court rejected the plaintiff's waiver argument because the statute of frauds requires that any modification or extension to the real estate purchase agreement's termination deadline must be in writing.  The holding in Rooney forecloses Plaintiffs' argument that Mayo, through its conduct and representations, extended the closing date in the Purchase Agreement.

Plaintiffs' allegation that Mayo could only terminate the Purchase Agreement by providing notice under Minnesota Statute § 559.21 also lacks merit.  The statute does not apply to real estate agreements that are "dependent on a contingency." Romain v. Pebble Creek Partners, 310 N.W.2d 118, 122 (Minn. 1981); Liebsch v. Abbott, 122 N.W.2d 578, 583 (Minn. 1963) ("[Section] 559.21 contemplates contracts of actual purchase and not agreements wholly dependent upon some contingency.").  Here, the Purchase Agreement was wholly dependent upon the satisfaction or written waiver of the Buyer Contingencies.  Purchase Agmt. §§ 4.1, 4.2.  Accordingly, Minnesota Statute § 559.21 does not apply.

Without an enforceable contract, Plaintiffs' claims for breach of contract and specific performance fail to state a claim upon which relief can be granted.  Counts II and III of the Complaint are dismissed.

**2. Equitable Estoppel Claim (Count IV)**

Plaintiffs claim that Mayo is equitably estopped from refusing to perform under the Purchase Agreement because Mayo continued to work with Plaintiffs and encourage their efforts to redevelop the PCC after the closing date expired.  Compl. ¶¶ 20, 62.

A party cannot invoke equitable estoppel where the result would be to circumvent the statute of frauds.  See Rooney, 246 N.W.2d at 176 ("Equitable estoppel cannot [be used to] avoid

the bar of the statute of frauds."). Equitable estoppel is not appropriate here because the statute of frauds requires that any modification or extension to the Purchase Agreement's closing deadline must be in writing. Plaintiffs' claim for equitable estoppel is dismissed.

### 3. Discrimination Claim Under 42 U.S.C. § 1981 (Count I)

Plaintiffs' discrimination under 42 U.S.C. § 1981 alleges that Mayo terminated the Purchase Agreement because of Mr. Murillo's race and his refusal to hire more white individuals or white-owned companies for the redevelopment of the PCC. Compl. ¶ 44. "To prevail [on a § 1981 claim], a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 140 S. Ct. 1009, 1019 (2020).

Here, the Purchase Agreement terminated on its own terms when Global Mercantile failed to satisfy the Buyer Contingencies and close by the closing date. As such, Plaintiffs cannot plausibly plead that race was a factor in the Purchase Agreement's termination, let alone the but-for cause of the termination.

Plaintiffs' § 1981 claim fails for the additional reason that they lack standing to bring the claim. Global Mercantile has no standing because a corporation "has no racial identity and cannot be the direct target of . . . discrimination." Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 97 S. Ct. 555, 562 (1977). Murillo lacks standing because he is not a party to the Purchase Agreement. See Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 479-80 (2006) ("[A] plaintiff cannot state a claim under § 1981 unless he has . . . rights under the existing . . . contract that he wishes to . . . enforce.").

Plaintiffs argue that Murillo has standing to assert a § 1981 claim because he is a

third-party beneficiary under the Purchase Agreement. To support their contention that Murillo is a third-party beneficiary, Plaintiffs note that Murillo is named as a "Grantee" on the Deed Use Restriction attached to the Purchase Agreement. See Purchase Agmt. Ex. 2.

Plaintiffs' argument fails for at least two reasons. First, the Complaint does not allege that Murillo is an intended third-party beneficiary and does not include factual allegations to support such a claim. See Gjovik v. Bemidji Loc. Bus Lines, 27 N.W.2d 273, 274 (Minn. 1947) ("If the plaintiff seeks to recover on the theory that the contract was one for a third-party beneficiary, the allegations must be sufficient to show that the contract was intended to benefit him directly and that he was not merely an incidental beneficiary."); Arvig Enterprises, Inc. v. Sansome St. Appraisers, Inc., No. 12-2510, 2013 WL 5728161, at *4 (D. Minn. Oct. 22, 2013) (rejecting plaintiffs' third-party beneficiary argument where plaintiffs did not sufficiently plead they were intended third-party beneficiaries).

Second, the Deed Use Restriction does not evince an intent by the parties to make Murillo a third-party beneficiary of the Purchase Agreement. Minnesota courts use two tests to determine whether a party qualifies as an intended third-party beneficiary. Cretex Companies, Inc. v. Constr. Leaders, Inc., 342 N.W.2d 135, 138 (Minn. 1984). Under the "intent to benefit" test, "the contract must express some intent by the parties to benefit the third party through contractual performance." Id. Under the "duty owed" test, "the promisor's performance under the contract must discharge a duty otherwise owed the third party by the promisee." Id.

The Deed Use Restriction is a restrictive covenant that restricts Murillo's use of the property. The "intent to benefit" test is not met because the Deed Use Restriction is intended to benefit Mayo alone. The "duty owed" test is not satisfied because Mayo is not promising to

discharge a duty owed to Murillo by requiring him to be bound by the use restrictions.  Thus, Murillo does not qualify as a third-party beneficiary under either test.

Because Plaintiffs have not plausibly alleged a claim under § 1981 and lack standing to do so, Count I of the Complaint is dismissed.

## IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant Mayo Clinic Health System-Southeast Minnesota Region's Motion to Dismiss [Docket No. 6] is **GRANTED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

Dated: December 17, 2021

s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT COURT